EUGENE G. IREDALE: SBN 75292
  egiredale@iredalelaw.com
JULIA YOO: SBN 231163
  jyoo@iredalelaw.com
PETER BIBRING: SBN 223981
  pbibring@iredalelaw.com
IREDALE & YOO, APC
105 West F Street, Fourth Floor
San Diego, CA 92101-6036
Telephone: (619) 233-1525
Fax: (619) 233-3221

JOSHUA J. NUNI: SBN 313724
  jnuni@peopleslaw.la
THE PEOPLE'S LAW PROJECT: LOS
ANGELES
250 E 1st St, Suite 1201
Los Angeles, CA 90012
T: (213) 293-9797
F: (213) 315-0020

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID BECK, an individual;<br><br>              Plaintiff,<br><br>        v.<br><br>COUNTY OF SAN DIEGO; SAN DIEGO COUNTY SHERIFF'S OFFICE DEPUTY THOMPSON, in his individual capacity; SAN DIEGO COUNTY SHERIFF'S OFFICE SERGEANT STILFIELD, in his individual capacity; and DOES 1-20;<br><br>              Defendants. | Case No. **'25CV3753 W    SBC**<br><br>**COMPLAINT**<br><br>1.  42 U.S.C. § 1983 – Excessive Force<br>2.  42 U.S.C. § 1983 – Unlawful Detention/Arrest<br>3.  42 U.S.C. § 1983 – *Monell*<br>4.  42 U.S.C. § 12131 – Violation of Title II of the Americans with Disabilities Act<br>5.  29 U.S.C. § 794 – Violation of the Rehabilitation Act<br>6.  Cal. Civil Code § 52.1 – Violation of the Bane Act<br>7.  Assault<br>8.  Battery<br>9.  False Imprisonment<br>10. Negligence<br>11. Intentional Infliction of Emotional Distress<br><br>DEMAND FOR JURY TRIAL |

**INTRODUCTION**

David Beck is a 59-year-old, self-employed pool technician and professional drummer who suffers from insulin-dependent diabetes. On the afternoon of November 25, 2024, Mr. Beck began experiencing a hypoglycemic episode as he was driving home from work. Mr. Beck responsibly pulled his work truck to the side of the road and remained in communication over the phone with his girlfriend, who immediately called 9-1-1 to request medical assistance. Defendant Deputy Thompson then arrived on the scene. He spoke with Mr. Beck and his girlfriend (who was still on a call with Mr. Beck on speakerphone), who informed him that Mr. Beck was experiencing a diabetic crisis. Deputy Thompson knew that Mr. Beck's girlfriend was on her way with food to address his low blood sugar and even told her where they were parked. But instead of rendering aid to a diabetic in medical crisis, Deputy Thompson ordered Mr. Beck out of his truck, threw him violently to the ground, and placed him in handcuffs. Then, in a thinly veiled attempt to justify his unlawful detention and use of force against Mr. Beck, Thompson issued Mr. Beck a criminal citation for Resisting Arrest, despite knowing that Mr. Beck had committed no crime. The San Diego District Attorney declined to prosecute the citation. Mr. Beck suffered a separated left shoulder, which required emergency medical care and lasting physical, economic, and emotional harm.

**JURISDICTION**

1.    This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a) because Plaintiff asserts claims arising under the laws of the United States including 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments of the United States Constitution. Plaintiff's state-law claims form part of the same case and controversy and are within the supplemental jurisdiction of the Court pursuant to 28 U.S.C. § 1367.

## VENUE

2.　　Venue is proper in the United States District Court of the Southern District of California pursuant to 28 U.S.C. § 1391(b)(1) as the Southern District is "a judicial district in which any defendant resides" and "all defendants are residents of the State in which the district is located." Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2), as the Southern District is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred. Venue is proper in this Court because all incidents, events, and occurrences giving rise to this action occurred in the County of San Diego, California.

## ADMINISTRATIVE PREREQUISITES

3.　　Plaintiff exhausted his administrative remedies by timely filing governmental tort claims with the County of San Diego pursuant to California Government Code §§ 910 *et seq.* Plaintiff filed a tort claim in his individual capacity on May 17, 2025. The County rejected Plaintiff's claim on June 24, 2025.

## PARTIES

4.　　Plaintiff David Beck is a resident of the City of Vista in the County of San Diego, California.

5.　　Defendant County of San Diego (the "County") is a duly organized public entity existing under the laws of the State of California. The San Diego County Sheriff's Office ("SDCSO") is the law enforcement agency for Defendant County of San Diego. Defendant County of San Diego is responsible for the actions, omissions, policies, procedures, practices, and customs of its various agents and agencies, including SDCSO and its agents and employees. At all relevant times, Defendant County of San Diego was responsible for ensuring that the actions, omissions, policies, procedures, practices, and customs of the SDCSO and its agents and employees complied with the laws of the United States and the

COMPLAINT

State of California.

6.      Defendant SDCSO Deputy Thompson is an SDCSO deputy who wrongfully detained, assaulted, and handcuffed Mr. Beck while he was experiencing a hypoglycemic episode. Deputy Thompson's first name is not known to Plaintiff as of the filing of this Complaint.

7.      Defendant SDCSO Sgt. Stilfield is an SDCSO sergeant who supervised Deputy Thompson at all relevant times. Sgt. Stilfield's first name is not known to Plaintiff as of the filing of this Complaint.

8.      The true names and capacities of Does 1-20 are unknown to Plaintiff, who otherwise sues these Defendants by such fictitious names. Plaintiff will amend this Complaint or seek leave to do so when the true names and capacities of these Defendants have been ascertained. Each of the fictitiously named Defendants is responsible in some manner for the acts, omissions, injuries, and damages alleged herein.

9.      Defendants Does 1-10 are SDCSO patrol deputies who responded to the scene after Deputy Thompson's use of force and initial seizure Mr. Beck. (Collectively, Deputy Thompson and Defendants Does 1-10 are referred to herein as the "Deputy Defendants.")

10.      Defendants Does 11-15 are officers and supervisors who reviewed the complaint Mr. Beck made with the SDCSO after the November 25, 2024, incident and approved and/or ratified the conduct of the Deputy Defendants alleged herein.

11.      Defendants Does 16-20 are officers and supervisors at SDCSO who failed to train the Deputy Defendants to identify and assist members of the public experiencing diabetic emergencies. (Collectively, the Deputy Defendants and Defendants Does 11-20 are referred to herein as the "Individual Defendants.")

12.      At all relevant times relevant to this Complaint, Defendant County of San Diego was the employer of the Individual Defendants, and the Individual

1  Defendants were acting under color of law within the course and scope of their

2  duties as deputies and officials for the SDCSO. In acting and failing to act as

3  alleged herein, the Individual Defendants were acting with the complete authority,

4  permission, and ratification of their principal, Defendant County of San Diego.

5          13.    Plaintiff is informed and believes and thereon alleges that at all times

6  relevant herein, each of the Defendants was the agent, employee, servant, joint

7  venturer, partner, and/or co-conspirator of the other Defendants named in this

8  Complaint and that at all times, each of the Defendants was acting within the

9  course and scope of said relationship with the other Defendants.

10         14.    All of the acts and omissions complained of herein by Plaintiff

11 against Defendants were done and performed by said Defendants by and through

12 their authorized agents, servants, and/or employees, all of whom at all relevant

13 times herein were acting within the course, purpose, and scope of said agency,

14 service, and/or employment capacity. Moreover, Defendants and their agents

15 ratified all of the acts and omissions complained of herein. Whenever and

16 wherever reference is made in this Complaint to any act or failure to act by a

17 Defendant or Defendants, such allegations and references shall also be deemed to

18 mean the acts and failures to act of each Defendant acting individually, jointly,

19 and severally.

20                          **FACTUAL ALLEGATIONS**

21 **I.     The November 25, 2024 Incident**

22         15.     David Beck is a self-employed pool and spa technician, as well as a

23 professional drummer.

24         16.    After decades of experience maintaining pools for property

25 management companies, Mr. Beck started his own small business, Beck's Pool &

26 Spa Care, in 2021. After digging into his savings to purchase the necessary

27 equipment, he began getting clients by word of mouth and referrals from existing

28 customers. By 2024, he had 65 clients and one assistant, performing most of the

physical labor involved in this work himself. He services pools throughout San Diego County.

17.    Mr. Beck started drumming when he was five-years-old.  His professional drumming career began with a band called Herazz, which had multiple record label contracts. When he moved to California in the late 2000s, Mr. Beck began playing with local bands in Los Angeles and then in the San Diego area. In about 2010, he joined a band called The Rangers, which continues to play over 100 shows a year at The Alley, a nightclub in Carlsbad, CA. Mr. Beck also plays with Ultraviolet 3D and Hometown Heroes, bands which perform at private parties and local music venues. Between these two groups, he performs approximately an additional 80 shows a year in the San Diego area.



18.     On November 25, 2024, around 2:15 p.m., Mr. Beck was driving home after a day of work servicing pools when he began to experience a hypoglycemic episode related to his diabetes.

19.     Mr. Beck was on the phone with his girlfriend, Lakeisha Holley, at the time, discussing Thanksgiving plans and groceries. During their call, Ms. Holley noticed that Mr. Beck was repeating himself, quickly realized something was wrong, and told Mr. Beck she believed his blood sugar was dropping.

20.     Mr. Beck pulled over to the side of the road to avoid causing any accidents. He was disoriented and weak. Ms. Holley asked Mr. Beck where he was, telling him that she would come find him, but due to his disorientation, Mr. Beck could not tell her where he was. Mr. Beck pleaded with Ms. Holley, "Find me! Find me!" Ms. Holley replied, "I'm trying! What do you see around you?" But Mr. Beck could only respond, "I don't know! I don't know!"

21.     Ms. Holley then called 9-1-1 for help and reported that Mr. Beck had been driving and had pulled over and was going into diabetic shock. She told the 9-1-1 operator that Mr. Beck was in Vista and asked if someone could find him to help him. The 9-1-1 operator told Ms. Holley that they couldn't find Mr. Beck without a specific location, but that if he called them, they would be able to track the call and locate him.

22.     Ms. Holley then called back Mr. Beck and told him to call 9-1-1, but Mr. Beck was too disoriented to understand what was going on.

23.     Knowing his general work route, Ms. Holley left the house to try to find Mr. Beck while staying on the phone with him.

24.     Ms. Holley then heard the voice of a woman who had come up to Mr. Beck's window and asked if he was okay. Ms. Holley tried to get her attention, but the woman walked away.

25.     On information and belief, the woman then called 9-1-1, reporting that a man was in trouble and giving the 9-1-1 operator Mr. Beck's location.

26.     A few minutes later, an SDCSO Deputy, later identified as Deputy Thompson, pulled behind Mr. Beck's parked work truck in his patrol cruiser.

27.     Deputy Thompson approached Mr. Beck's truck and spoke with Mr. Beck and Ms. Holley, who was on a phone call with Mr. Beck on the truck's speakerphone system.

28.     Mr. Beck and Ms. Holley both informed Deputy Thompson right away that Mr. Beck had diabetes, that he was experiencing a low blood sugar attack, and that he needed medical assistance.

29.     On information and belief, during his initial conversation with Mr. Beck, Deputy Thompson also saw the glucometer device on Mr. Beck's left arm, which was visible below the sleeve of Mr. Beck's t-shirt.

30.     Ms. Holley asked Deputy Thompson where Mr. Beck and he were, and Deputy Thompson informed her that they were at the intersection of Primrose Ave. and Azalea Dr.

31.     Moments later, Ms. Holley heard a loud thump over the phone, and the call disconnected.

32.     On information and belief, despite being informed that Mr. Beck was a diabetic and experiencing a hypoglycemic episode, Deputy Thompson inexplicably ordered Mr. Beck to get out of his truck instead of calling for medical help.

33.     On information and belief, after briefly exiting the vehicle, the disoriented Mr. Beck turned to return to the vehicle, at which point Deputy Thompson began to physically detain him.

34.     Deputy Thompson then threw Mr. Beck to the ground and forcefully handcuffed him. Deputy Thompson had no reason to think that Mr. Beck had committed any crime or that he posed any threat to Deputy Thompson or anyone else at the time.

35.     In doing so, Deputy Thompson caused Mr. Beck to suffer a joint

separation in his left shoulder and abrasions to his face.

36.     Deputy Thompson then forcibly placed Mr. Beck handcuffed into the back of his patrol cruiser, where Mr. Beck continued to experience the symptoms of a severe hypoglycemic crisis.

37.     On information and belief, Deputy Thompson then called for paramedics to respond to the scene.

38.     When the paramedics arrived, Deputy Thompson still had Mr. Beck restrained in the back of his patrol car.

39.     The paramedics then measured Mr. Beck's blood sugar, which they discovered was dangerously low, at 46 mg/dL. The paramedics noted "minor slurred speech," "clammy skins," and that Mr. Beck was "confused on the date." They also reported "dried blood to the mouth and face area."

40.     The paramedics raised Mr. Beck's blood sugar levels with oral glucose.

41.     On information and belief, before the paramedics arrived, a number of other SDCSO deputies arrived at the scene.

42.     Deputy Thompson and the other SDCSO deputies kept Mr. Beck in handcuffs while he was receiving medical treatment from the paramedics.

43.     Ms. Holley then arrived with a chocolate chip cookie and fruit juice for Mr. Beck, having learned of their location earlier over the phone from Deputy Thompson.

44.     When Ms. Holley arrived, she saw Mr. Beck in handcuffs while receiving medical treatment.

45.     On information and belief, there were three SDCSO deputies on the scene, Deputy Thompson, a female deputy (Defendant Doe 1), and another male deputy (Defendant Doe 2).

46.     The female deputy, Defendant Doe 1, told Ms. Holley to sit down on the back of the paramedics' vehicle.

47.     While Ms. Holley recounted to Defendant Doe 1 what had happened, Defendant Doe 1 told Ms. Holley that a woman had called 9-1-1 and reported a man in distress.

48.     Deputy Thompson then interrupted the conversation and stated in substance, "You told me he was a diabetic, and I saw the thing on his arm. I had to rough him up a little bit. I gave him a resisting arrest."

49.     Ms. Holley then asked, "Isn't that going to hurt him?"

50.     In response, Deputy Thompson merely shrugged.

51.     The other male deputy, Defendant Doe 2, was standing next to Mr. Beck while Mr. Beck was handcuffed and receiving medical treatment.

52.     After receiving glucose gel from the paramedics, Mr. Beck started to come to. When he did, he saw deputies talking with Ms. Holley and realized he was in handcuffs. He then asked Defendant Doe 2 if he could take the handcuffs off because they were hurting him. Defendant Doe 2 only replied, "We'll take them off when we're ready."

53.     Mr. Beck remained in handcuffs while the paramedics tested his blood sugar again.

54.     The paramedics said that Mr. Beck's glucose was still low, so they planned to take him to the hospital. Ms. Holley told them that she could take Mr. Beck back home, which was only a quarter-mile or so away, and give him food to raise his blood sugar levels. The paramedics then agreed to release Mr. Beck into Ms. Holley's care.

55.     Deputy Thompson then issued Mr. Beck a citation for Resisting Arrest, at which point Mr. Beck's handcuffs were also finally removed.

56.     One of the paramedics offered to drive Mr. Beck's truck home so that it wouldn't be towed and impounded.

57.     When Ms. Holley got Mr. Beck home, he was in excruciating pain.

58.     Mr. Beck's pain was so intense that it brought him to tears.

59.     About an hour after returning home, Mr. Beck and Ms. Holley called the SDCSO Vista Station and spoke with a receptionist. Mr. Beck told the receptionist that there had been an incident involving Deputy Thompson and asked to speak with Deputy Thompson's supervisor.

60.     A few hours later, Deputy Thompson's supervisor, Defendant Sergeant Stilfield, returned Mr. Beck's call and spoke with both Mr. Beck and Ms. Holley on speakerphone.

61.     Mr. Beck told Sgt. Stilfield that he had had an incident with Deputy Thompson. Sgt. Stilfield told Mr. Beck that he was aware of the incident, which had already been reported to him.

62.     Mr. Beck told Sgt. Stilfield that he felt that Deputy Thompson had used excessive force on him. Sgt. Stilfield told Mr. Beck that Deputy Thompson had told him that Mr. Beck had tried to take a swing at him and also that Mr. Beck had tried to drive off.

63.     Ms. Holley asked if Sgt. Stilfield had watched the body camera footage. Sgt Stilfield responded that he hadn't—he was "going off of" what Deputy Thompson had told him.

64.     Ms. Holley asked Sgt. Stilfield to watch the body camera footage. Sgt. Stilfield told her that he had other matters to attend to and that it would take a lot of steps to watch it.

65.     Mr. Beck then asked Sgt. Stilfield for a copy of the footage, but Sgt. Stilfield responded, "You're going to have to subpoena it."

66.     Upon information and belief, Sgt. Stilfield, as Deputy Thompson's supervisor reviewed the incident and nonetheless approved the submission of charges against Mr. Beck to the San Diego County District Attorney, despite knowing there was no probable cause for those charges.

67.     On January 10, 2025, the San Diego County District Attorney's Office declined to prosecute the Resisting Arrest citation Deputy Thompson had

issued Mr. Beck.

68.    The injuries Mr. Beck suffered due to Deputy Thompson caused and continued to cause Mr. Beck significant pain. They have interfered with his ability to work in his pool and spa care business and as a professional drummer, causing him financial harm.  And the incident and his injuries have caused him significant emotional distress.

## II.    Defendant County of San Diego's Failure to Maintain Adequate Policies for Patrol Personnel Encounters with Persons Experiencing Diabetic Emergencies

69.    According to the U.S. Center for Disease Control and Preventions 2024 National Diabetes Statistics report, an estimated 38.1 million American adults 18 or older—14.7% of all U.S. adults— had diabetes.[1]

70.    The need for law enforcement officers to be able recognize hypoglycemia and diabetic emergencies is widely recognized.

71.    The California Commission on Peace Officer Standards and Training ("POST"), which sets basic training requirements for peace officers in California, requires as part of basic training on medical emergencies that all peace officers be instructed on "Diabetic Emergencies," including low blood sugar. POST's workbook for its basic training requirements for Learning Domain 34, on Medical Emergencies, notes that the indicators of a low-blood-sugar diabetic emergency include "Hostile or aggressive behavior" and that the person "May appear intoxicated."[2] POST's workbook provides officers with this caution about diabetic emergencies:

---

[1] *National Diabetes Statistics Report*, U.S Centers for Disease Control and Prevention (May 15, 2024), at https://www.cdc.gov/diabetes/php/data-research/index.html [perma.cc/58LY-365D].

[2] *See* POST, Basic Course Workbook Series, Student Materials, *Learning Domain 34 — First Aid, CPR, and AED*, at 5-22 to 5-25 (Version 7.0, 2021), at https://post.ca.gov/portals/0/post_docs/basic_course_resources/workbooks/LD_34-V7.0.pdf [perma.cc/385N-UHJK].

There are a number of indicators of a diabetic emergency that are similar to indications of alcohol intoxication or substance abuse.

- Aggressiveness
- Combativeness
- Uncooperative behavior
- Confusion, dazed appearance
- Decreased level of consciousness
- Impaired motor skills

Peace officers should *not* assume that a person exhibiting these indicators is intoxicated without further questioning and assessment.

The training indicates that because diabetic emergencies "can be extremely dangerous and life-threatening if left untreated, a possible diabetic emergency must be thoroughly assessed and first aid measures taken immediately."

72.     Defendant County of San Diego recognized the importance of training its deputies on recognizing and responding to diabetic emergencies and people experiencing hypoglycemia, as SDCSO provided policies and training to address the issue to deputies assigned to its jails in the Detention Services Bureau.

73.     On July 14, 2023, the SDCSO, Detention Services Bureau, Detention In-Service Training Unit published a training bulletin titled, *Recognizing Behavioral vs. Medical vs. Mental Health Concerns*.

74.     This bulletin's purpose was "to remind staff that some medical emergencies can mimic the appearance of mental health conditions or general non-compliance." The July 14, 2023 Bulletin then addressed diabetic emergencies and low blood sugar attacks specifically, explaining, "Incarcerated people may appear to be under the influence of drugs or alcohol when experiencing a diabetic emergency." "If unsure of the subject's symptoms or behaviors," the bulletin cautioned, "remember the medical condition is priority."

75.     On December 8, 2023, the SDCSO, Detention Services Bureau,

Detention In-Service Training Unit published another training bulletin titled, *Recognizing Diabetic Emergencies*.

76. The stated purpose of the December 8, 2023 Training Bulletin was "to assist staff in understanding what diabetes is and how to recognize a diabetic emergency."

77. The December 8, 2023 Training Bulletin explained, "It is important to understand that several indicators of a diabetic emergency are similar to indications of alcohol intoxication or substance abuse." "It is imperative when an individual presents these symptoms," the bulletin instructed, "it is recognized as a medical priority."

78. The bulletin implored that "[d]eputies must respond to these medical emergencies with URGENCY while maintaining officer safety," cautioning that "[t]hese conditions can quickly become life-threatening if left untreated."

79. Accordingly, the bulletin instructed deputies to be "thorough in their investigation and never assume the individual is under the influence of alcohol or controlled substances without further questioning and assessment."

80. The December 8, 2023, Training Bulletin also foresaw the possibility that the person experiencing the diabetic emergency might notify SDCSO about their condition, explaining as follows:

> People with diabetes are often familiar with symptoms related to their current state. They may alert staff of changes in their condition related to high or low blood sugar and symptoms that may lead to a dangerous state. *When a diabetic incarcerated person notifies any staff member that they are symptomatic, immediately contact health staff for an assessment.*

*Id.* (emphasis added).

81. Although SDCSO recognized the importance of training deputies on recognizing and responding to diabetic emergencies and people experiencing hypoglycemia, as demonstrated by the training bulletins it provided to deputies in the jails, it never provided such training to deputies assigned to patrol.

82.    On information and belief, despite Defendant County of San Diego's own acknowledgement through the publication of the two bulletins above that training its personnel to identify diabetic emergencies was critically important for the safety of individuals coming into contact with its deputies, SDCSO directed both bulletins only to SDCSO deputies and staff employed in its jails, and not to officers on patrol.

83.    On information and belief, no training bulletin similar either to the July 14, 2023, Training Bulletin or the December 8, 2023, Training Bulletin was circulated to SDCSO patrol deputies—including Deputy Thompson and the other Deputy Defendants—despite the high likelihood that patrol personnel would encounter people experiencing diabetic emergencies in the field.

84.    In fact, the SDCSO Law Enforcement Services Bureau's Field Operations Manual makes no mention of diabetic emergencies.

85.    On information and belief, the only mention of diabetes or diabetic emergencies in any of the training materials the SDCSO utilizes for patrol personnel appears in the SDCSO Policy and Procedure Manual, Use of Force Guidelines, which lists "diabetic shock" as one of a number of conditions, including "reactions to controlled substances" and "head injuries" that could constitute an "agitated chaotic event," which the guidelines define as "a state of agitation, excitability, paranoia, aggression, and apparent immunity to pain, but the basis of the cause is unknown."

86.    SDCSO's Use of Force Guidelines provide no information or instructions to patrol personnel regarding how to distinguish between diabetic emergencies such as "diabetic shock" and these other conditions.

87.    Moreover, the Use of Force Guidelines prime SDCSO patrol deputies to view symptoms of diabetic emergencies not as indications of an actual diabetic condition, but rather as indications of an "agitated chaotic event," instructing deputies, "Some of the behavioral cues of an agitated chaotic event can mimic

other medical conditions such as diabetes, head trauma, hyperthyroidism (overactive thyroid) or hyperthermia (abnormally high body temperature)." *Id.*

88.     On information and belief, the SDCSO's conflation of diabetic emergencies with "agitated chronic events"—which the SDCSO claims are characterized by "excitability, paranoia, aggression, and apparent immunity to pain"—has caused SDCSO patrol personnel to view persons experiencing diabetic emergencies like Mr. Beck as threats to officer safety and criminal incidents rather than medical emergencies, which encourages deputies to respond to diabetic emergencies by using physical force and restraints, even when that is unnecessary, unreasonable, and a violation of the law.

89.     Defendant County of San Diego knew or should have known that the failure to adequately train deputies to identify and interact with individuals experiencing diabetic emergencies such as hypoglycemia made it highly likely that SDCSO deputies would engage in conduct that would deprive persons such as Mr. Beck of their rights.

90.     Defendant County of San Diego was deliberately indifferent to the obvious consequences of the failure to train its patrol deputies adequately in encountering members of the public experiencing diabetic emergencies, like the hypoglycemic episode suffered by Mr. Beck on November 25, 2024.

91.     This lack of training led to Mr. Beck's injuries at the hands of Deputy Thompson.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983 – Excessive Force
### Against Defendant Deputy Thompson and Does 16-20

92.     Plaintiff realleges and incorporates by reference the allegations of all preceding and subsequent paragraphs as though set forth in full herein.

93.     In throwing Mr. Beck to the ground, forcefully handcuffing him and

placing him in the back of his police cruiser, and using other force on Mr. Beck as Mr. Beck was experiencing a diabetic emergency, Deputy Thompson used unreasonable force in violation of Mr. Beck's rights under Fourth and Fourteenth Amendments.

94.    At the time Deputy Thompson used force on him, he knew that Mr. Beck was suffering from a diabetic emergency and had pulled his vehicle safely to the side of the road. Thompon had no reason to believe that Mr. Beck had committed any crime or that he posed any threat to himself or others.

95.    Deputy Thompson had an obligation to immediately call the paramedics once he was advised that this was a medical emergency. Instead, Thompson inexplicably tried to get Mr. Beck out of the car as if he was investigating a crime. Mr. Beck was obviously disoriented and confused and unable to follow directions.

96.    By getting Mr. Beck out of the car unnecessarily, and in assaulting and arresting Mr. Beck, Thompson turned what was then a static situation into an emergency.

97.    The foregoing wrongful acts and failures to act of Deputy Thompson seriously injured Mr. Beck. As a direct and proximate result of Thompson's actions and omissions, Mr. Beck suffered damages including physical pain, severe mental and emotional anguish, humiliation, reputational harm, loss of income, and continuing anxiety and trauma regarding interactions with law enforcement.

98.    Deputy Thompson's conduct was willful, wanton, malicious, and oppressive, thereby justifying an award of punitive damages in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

99.    Upon information and belief, Defendant Does 16-20 are responsible for training SDCSO patrol deputies, and knew or should have known that deputies who lacked training in how to identify and assist members of the public

experiencing diabetic emergencies would likely misinterpret and mishandle the symptoms of diabetic emergencies, including by interpreting those symptoms as signs of aggression, volitional noncompliance, drug or alcohol abuse, or criminal activity, leading to a significant risk deputies would unjustifiably use of force on, or detain or arrest, people suffering diabetic emergencies.

**SECOND CAUSE OF ACTION**
**42 U.S.C. § 1983 – Unlawful Detention/Arrest**
**Against the Deputy Defendants, Defendant Sgt. Stilfield, and Does 11-20**

100.    Plaintiff realleges and incorporates by reference the allegations of all preceding and subsequent paragraphs as though set forth in full herein.

101.    In handcuffing Mr. Beck and detaining him in the back of Deputy Thompson's patrol car, the Deputy Defendants subjected Mr. Beck him to an unreasonable seizure of Mr. Beck's person, in violation of his rights under the Fourth and Fourteenth Amendments.

102.    Despite being expressly informed that Mr. Beck was a diabetic in medical distress and required assistance, Deputy Thompson ordered Mr. Beck out of his vehicle for no reason, physically restrained him, threw him to the ground, handcuffed him, and detained him in the back of his patrol cruiser, where Mr. Beck continued to experience a life-threatening hypoglycemic episode.

103.    Upon information and belief, the other Deputy Defendants also know that Mr. Beck was experiencing a diabetic emergency.

104.    Neither Thompson nor any of the other Deputy Defendants had any reason to believe that Mr. Beck posed any threat to himself or others.  Nor did Thompson or any of the other Deputy Defendants have any reason to believe Mr. Beck had committed, was committing, or was about to commit any crime.

105.    Each of the Deputy Defendants was both personally involved and an integral participant in the violation of Mr. Beck's constitutional rights because each deputy was aware of the unlawful actions of the other deputies, did not

object to these violations of Mr. Beck's rights, and participated in the violations by performing police functions, including meaningful participation in the needless and unnecessary detention of Mr. Beck after Deputy Thompson's unreasonable use of force.

106.   The Deputy Defendants acted unreasonably in detaining Mr. Beck in the back of the patrol car and then continuing to keep Mr. Beck in handcuffs even while he was receiving medical attention from the paramedics.

107.   Deputy Thompson knew Mr. Beck was a diabetic in medical distress. He knew or should have known that any failure by Mr. Beck to comply with his commands was due to his medical condition, was not intentional conduct, and did not violate any law. Despite this, Deputy Thompson issued Mr. Beck a criminal citation for Resisting Arrest.

108.   Deputy Thompson knew or should have known that he lacked probable cause to issue a citation for resisting arrest, but he did so anyway.

109.   On information and belief, Deputy Thompson issued the citation in an effort to justify his unlawful detention and use of force against Mr. Beck.

110.   Each of the Deputy Defendants was both personally involved and an integral participant in the violation of Mr. Beck's constitutional rights because each deputy was aware of the unlawful actions of the other deputies, did not object to these violations of Mr. Beck's rights, and participated in the violations by performing police functions, including meaningful participation in decision to issue Mr. Beck a false citation for Resisting Arrest. The foregoing wrongful acts and failures to act of the Deputy Defendants seriously injured Mr. Beck. As a direct and proximate result of these actions and omissions, and each of them, Mr. Beck suffered damages including physical pain, emotional distress, humiliation, reputational harm, loss of income, and continuing anxiety and trauma regarding interactions with law enforcement.

111.   The Deputy Defendants' conduct was willful, wanton, malicious, and

oppressive, thereby justifying an award of punitive damages in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

112.    Upon information and belief, Sgt. Stilfield and Defendant Does 11-15 reviewed the complaint Mr. Beck made with the SDCSO after the November 25, 2024, incident, investigated the allegations, and made the conscious and deliberate determination that Deputy Thompson and the Deputy Defendants acted according to law and SDCSO policy, thus approving and ratifying their conduct, and acquiesced in the violation, including by approving the submission of charges against Mr. Beck to the San Diego County District Attorney despite knowing there was no probable cause for those charges..

113.    Upon information and belief, Defendant Does 16-20 are responsible for training SDCSO patrol deputies, and knew or should have known that deputies who lacked training in how to identify and assist members of the public experiencing diabetic emergencies would likely misinterpret and mishandle the symptoms of diabetic emergencies, including by interpreting those symptoms as signs of aggression, volitional noncompliance, drug or alcohol abuse, or criminal activity, leading to a significant risk deputies would unjustifiably use of force on, or detain or arrest, people suffering diabetic emergencies.

**THIRD CAUSE OF ACTION**
**42 U.S.C. § 1983 – *Monell***
**Against Defendant County of San Diego**

114.    Plaintiff realleges and incorporates by reference the allegations of all preceding and subsequent paragraphs as though set forth in full herein.

115.    Deputy Thompson and the Deputy Defendants acted pursuant to expressly adopted official policies or longstanding practices or customs of Defendant County of San Diego and the SDCSO. These include policies and longstanding practices or customs on the use of force in situations including, but

not limited to, encounters with individuals suffering from physical disabilities and medical conditions such as diabetes that can cause hypoglycemic episodes.

116.    In addition, Defendant County of San Diego knew or should have known about the critical importance of training its deputies to identify and respond appropriately to individuals experiencing hypoglycemic episodes and similar conditions. The County knew or should have known that the failure to adequately train SDCSO deputies to identify and respond appropriately to individuals experiencing diabetic hypoglycemic episodes and similar conditions made it highly likely that SDCSO deputies treat such people as if they were under the influence, aggressive, or otherwise engaged in criminal activity or a threat to officers or others.

117.    Without the requisite training, the individual deputies in this case treated Mr. Beck as if he was under the influence, aggressive or a threat to others.

118.    The County knew or should have known that its failure to train SDCSO deputies would deprive persons such as Mr. Beck of their rights. Defendant County of San Diego was thus deliberately indifferent to the obvious consequences of the failure to train deputies adequately. This lack of training led to Mr. Beck's injuries at the hands of Deputy Thompson.

119.    Defendant County of San Diego's official policies and/or longstanding practices or customs are so closely related to the deprivation of Mr. Beck's rights as to be the moving force that caused his injuries.

120.    The foregoing wrongful acts and failures to act of Defendant County of San Diego seriously injured Mr. Beck. As a direct and proximate result of these actions and omissions, Mr. Beck suffered damages including physical pain, emotional distress, humiliation, reputational harm, loss of income, and continuing anxiety and trauma regarding interactions with law enforcement.

**FOURTH CAUSE OF ACTION**
**42 U.S.C. § 12131 – Violation of Title II of the**
**Americans with Disabilities Act**
**Against Defendant County of San Diego**

121.    Plaintiff realleges and incorporates by reference the allegations of all preceding and subsequent paragraphs as though set forth in full herein.

122.    Congress enacted the Americans With Disabilities Act ("ADA") upon finding, among other things, that "society has tended to isolate and segregate individuals with disabilities" and that such forms for discrimination continue to be a "serious and pervasive social problem." 42 U.S.C. §12101(a)(2).

123.    In response to these findings, Congress explicitly stated that the purpose of the ADA is to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1)-(2).

124.    Title II of the ADA provides in pertinent part: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

125.    The U.S. Department of Justice has implemented regulations at Title II, 28 C.F.R. § 35.160, which require public entities to take appropriate steps to ensure that communications with members of the public with disabilities are as effective as communications with others.

126.    At all times relevant to this action, Defendant County of San Diego was a public entity within the meaning of Title II of the ADA and provided programs, services, and activities to the general public.

127.    At all times relevant to this action, Mr. Beck is and has been a "qualified individual with a disability" as defined under the Americans with

Disabilities Act (ADA), 42 U.S.C. § 12131(2), in that he suffers from Type II Diabetes, a physical impairment that substantially limits a major life activity, namely, endocrine function. *See* 29 C.F.R. § 1630.2(j)(3)(iii).

128.   The U.S. Department of Justice, Civil Rights Division, Disability Rights section has published, "Commonly Asked Questions About the Americans with Disabilities Act and Law Enforcement," a document in which the U.S. Department of Justice provides guidelines in the interpretation of Title II of the ADA (the Guidelines). In the Guidelines, the Department of Justice notes that the ADA affects virtually everything that police officers and deputies do, including providing emergency medical services, arresting, booking, and holding suspects, and other duties.

129.   Deputy Thompson was made aware of Mr. Beck's disability by Mr. Beck and Ms. Holley both directly informing Deputy Thompson when he approached Mr. Beck's vehicle that Mr. Beck was a diabetic, that he was experiencing a low blood sugar attack, and that he needed medical assistance.

130.   On information and belief, Deputy Thompson was also made aware of Mr. Beck's disability during his initial conversation with Mr. Beck, when Deputy Thompson saw the glucometer device on Mr. Beck's left arm.

131.   Ms. Holley also informed a 9-1-1 operator that Mr. Beck was driving and had pulled over and was going into diabetic shock somewhere in Vista, CA, before Deputy Thompson responded to the later 9-1-1 call regarding a man in distress in a truck on the side of the road in Vista, CA.

132.   During their encounter with Mr. Beck, the Deputy Defendants failed to reasonably accommodate Mr. Beck's disability, seizing him in circumstances where other non-disabled persons would not have been seized and then causing him to suffer greater injury in that process than other non-disabled seized persons.

133.   Through the acts and omissions of Defendant County of San Diego and their agents and employees described herein, Defendant County of San Diego

violated Title II of the ADA by excluding Mr. Beck from participation in, by denying him the benefits of, and subjecting him to discrimination in the benefits and services it provides to the general public.

134.  Plaintiff is informed, believes, and thereon alleges that Defendant County of San Diego and its agents and employees have failed and continue to fail to take into account and provide reasonable accommodations for persons suffering from physical disabilities and medical conditions such as diabetes that can cause hypoglycemic episodes by failing to, among other things: individuals experiencing hypoglycemic episodes and similar conditions, individuals suffering from physical disabilities and medical conditions such as diabetes that can cause hypoglycemic episodes

    a.   Adopt and enforce policies and procedures for communicating effectively, controlling, and interacting with persons experiencing hypoglycemic episodes and similar conditions;

    b.   Adopt and enforce policies and procedures for providing persons experiencing hypoglycemic episodes and similar conditions access to medical facilities, including the provision of employees with medical training and medical resources to communicate, interact with, and control such persons;

    c.   Train and supervise SDCSO patrol deputies to communicate effectively, control, interact with, and safely de-escalate encounters persons experiencing hypoglycemic episodes and similar conditions;

    d.   Train and supervise SDCSO patrol deputies regarding the cognition and behavior of persons experiencing hypoglycemic episodes and similar conditions; and

    e.   Train and supervise SDCSO patrol deputies to not use force on persons experiencing hypoglycemic episodes and similar

1    conditions.

2        135.   The foregoing wrongful acts and failures to act of Defendant County

3    of San Diego seriously injured Mr. Beck. As a direct and proximate result of these

4    actions and omissions, Mr. Beck suffered damages including physical pain,

5    emotional distress, humiliation, reputational harm, loss of income, and continuing

6    anxiety and trauma regarding interactions with law enforcement.

7        136.   Pursuant to 42 U.S.C. § 12133, Plaintiff is entitled to recover the

8    compensatory damages described herein, and reasonable attorneys' fees and costs

9    incurred in bringing this action.

## FIFTH CAUSE OF ACTION
### 29 U.S.C. § 794 – Violation of the Rehabilitation Act
### Against Defendant County of San Diego

12       137.   Plaintiff realleges and incorporates by reference the allegations of all

13   preceding paragraphs as though set forth in full herein.

14       138.   Section 504 of the Rehabilitation Act of 1973 provides in pertinent

15   part: "[N]o otherwise qualified individual with a disability ... shall, solely by

16   reason of her or his disability, be excluded from the participation in, be denied the

17   benefits, or be subjected to discrimination under any program or activity receiving

18   federal financial assistance . . . ." 29 U.S.C. § 794.

19       139.   Mr. Beck, at all times relevant herein, is and has been a qualified

20   individual with a disability within the meaning of the Rehabilitation Act because

21   he suffers from Type II Diabetes, a physical impairment that substantially limits a

22   major life activity, namely, endocrine function. *See* 29 U.S.C. § 705(20)(B); 29

23   C.F.R. § 1630.2(j)(3)(iii).

24       140.   At all times relevant to this action Defendant County of San Diego

25   was a recipient of Federal funding within the meaning of the Rehabilitation Act.

26       141.   Through its acts and omissions described herein, Defendant County

27   of San Diego has violated the Rehabilitation Act, including all applicable

28

implementing regulations, by excluding Mr. Beck, from participation in, denying him the benefits of, and subjecting him to discrimination in the benefits and services it provides to the general public.

142.    The foregoing wrongful acts and failures to act of Defendant County of San Diego seriously injured Mr. Beck. As a direct and proximate result of these actions and omissions, Mr. Beck suffered damages including physical pain, emotional distress, humiliation, reputational harm, loss of income, and continuing anxiety and trauma regarding interactions with law enforcement.

143.    Pursuant to 29 U.S.C. § 794(a), Plaintiff is entitled to recover the damages described in this Complaint and reasonable attorneys' fees and costs incurred in bringing this action.

## SIXTH CAUSE OF ACTION
### Cal. Civil Code § 52.1 – Violation of the Bane Act
### Against All Defendants

144.    Plaintiff realleges and incorporates by reference the allegations of all preceding paragraphs as though set forth in full herein.

145.    Section 13 of Article I of the California Constitution and the Fourth Amendment to the United States Constitution guarantee the rights of persons to be free from arrests without probable cause, unreasonable searches and seizures, and use of unnecessary and excessive force on the part of law enforcement officers. And Section 7 of Article I of the California Constitution and the Fourteenth Amendment to the United States Constitution provide that a person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws.

146.    Defendants, by engaging in the wrongful acts and failures to act alleged in this action, interfered with Mr. Beck's rights by threats, intimidation, or coercion, and acted with reckless disregard of those rights.

147.    The foregoing wrongful acts and failures to act of Defendants

seriously injured Mr. Beck. As a direct and proximate result of these actions and omissions, Mr. Beck suffered damages including physical pain, emotional distress, humiliation, reputational harm, loss of income, and continuing anxiety and trauma regarding interactions with law enforcement.

148.   Plaintiff is entitled to statutory damages under Civil Code section 52, as well as compensatory and punitive damages and attorneys' fees.

149.   Defendants' conduct was willful, wanton, malicious, and oppressive, thereby justifying an award of punitive damages against the Individual Defendants (but not Defendant County of San Diego) in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

### SEVENTH CAUSE OF ACTION
#### Assault
#### Against All Defendants

150.   Plaintiff realleges and incorporates by reference the allegations of all preceding paragraphs as though set forth in full herein.

151.   The Deputy Defendants intended to cause harmful or offensive contact with Mr. Beck, and threatened to touch Mr. Beck in a harmful or offensive manner.

152.   Mr. Beck reasonably believed that he was about to be touched in a harmful or offensive manner, and it reasonably appeared to Mr. Beck that the Deputy Defendants were about to carry out their threats.

153.   Mr. Beck did not consent to the Deputy Defendants' conduct.

154.   Mr. Beck was harmed.

155.   The Deputy Defendants' conduct was a substantial factor in causing Mr. Beck's harm.

156.   Each of the Deputy Defendants was both personally involved and an integral participant in the violation of Mr. Beck's constitutional rights because each deputy was aware of the unlawful actions of the other deputies, did not object to these violations of Mr. Beck's rights, and participated in the violations by

performing police functions. Each deputy gave substantial assistance or encouragement to the other deputies and each deputy's conduct was a substantial factor in causing harm to Plaintiff.

157.   Defendant County of San Diego is vicariously liable for the actions of the Deputy Defendants.

158.   Defendants' conduct was willful, wanton, malicious, and oppressive, thereby justifying an award of punitive damages against the Individual Defendants (but not Defendant County of San Diego) in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## EIGHTH CAUSE OF ACTION
### Battery
### Against All Defendants

159.   Plaintiff realleges and incorporates by reference the allegations of all preceding paragraphs as though set forth in full herein.

160.   The Defendant Deputies intentionally touched Mr. Beck, or caused him to be touched.

161.   Mr. Beck did not consent to that touching.

162.   Deputy Thompson used unreasonable force.

163.   Mr. Beck did not consent to the use of that force.

164.   Mr. Beck was harmed.

165.   The Deputy Defendants' conduct was a substantial factor in causing Mr. Beck's harm.

166.   Each of the Deputy Defendants was both personally involved and an integral participant in the violation of Mr. Beck's constitutional rights because each Deputy was aware of the unlawful actions of the other deputies, did not object to these violations of Mr. Beck's rights, and participated in the violations by performing police functions. Each deputy gave substantial assistance or encouragement to the other deputies and each deputy's conduct was a substantial factor in causing harm to Plaintiff.

167.   Defendant County of San Diego is vicariously liable for the actions of the Deputy Defendants.

168.   Defendants' conduct was willful, wanton, malicious, and oppressive, thereby justifying an award of punitive damages against the Individual Defendants (but not Defendant County of San Diego) in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

**NINTH CAUSE OF ACTION**
**False Imprisonment**
**Against the Deputy Defendants**

169.   Plaintiff realleges and incorporates by reference the allegations of all preceding paragraphs as though set forth in full herein.

170.   A person is liable for false imprisonment if he or she "authorizes encourages, directs, or assists an officer to do an unlawful act or procures an unlawful arrest, without process, or participates in the unlawful arrest." *Du Lac v. PermaTrans Products, Inc.* (1980) 103 Cal.App.3d 937, 941.

171.   There was no legal basis to detain or arrest Mr. Beck, who had committed no crimes.

172.   The Defendant Deputies knowingly caused, assisted, or participated in an unlawful arrest of Mr. Beck.

173.   Despite being informed that Mr. Beck was a diabetic in medical distress, Deputy Thompson ordered Mr. Beck from his vehicle, forcefully detained him, and subsequently issued Mr. Beck a criminal citation for Resisting Arrest.

174.   The citation was unsupported by probable cause, as Mr. Beck's conduct was entirely attributable to his medical condition and did not constitute a violation of law.

175.   On information and belief, Deputy Thompson issued the citation in an effort to justify his unlawful detention and use of force against Mr. Beck.

176.   The San Diego County District Attorney later declined to prosecute the citation, confirming the absence of probable cause and further demonstrating the baselessness of Deputy Thompson's actions.

177.   On information and belief, the Defendant Deputies knew Mr. Beck was experiencing a medical emergency and had not committed an arrestable offense.

178.   Each of the Deputy Defendants was both personally involved and an integral participant in the violation of Mr. Beck's constitutional rights because each Deputy was aware of the unlawful actions of the other Deputies, did not object to these violations of Mr. Beck's rights, and participated in the violations by performing police functions, including meaningful participation in keeping Mr. Beck detained in the back of Deputy Thompson's patrol vehicle, keeping Mr. Beck in handcuffs during while he received medical assistance, and issuing Mr. Beck a retaliatory, unjustified citation for Resisting Arrest.

179.   The foregoing wrongful acts and failures to act of the Deputy Defendants seriously injured Mr. Beck. As a direct and proximate result of these actions and omissions, and each of them, Mr. Beck suffered damages including physical pain, emotional distress, humiliation, reputational harm, loss of income, and continuing anxiety and trauma regarding interactions with law enforcement.

180.   The Deputy Defendants' conduct was willful, wanton, malicious, and oppressive, thereby justifying an award of punitive damages in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

### TENTH CAUSE OF ACTION
### Negligence
### Against All Defendants

181.   Plaintiff realleges and incorporates by reference the allegations of all preceding paragraphs as though set forth in full herein.

182.    Defendants had a duty to Mr. Beck to act with ordinary care and prudence so as not to cause harm or injury to another.

183.    Pursuant to Government Code § 820, except as provided by statute, a public employee is liable for injury caused by their act or omission to the same extent as a private person, and that liability is subject to any defenses that would be available to the public employee if they were a private person.

184.    Pursuant to Government Code § 820.4, public employees are liable for false arrest or false imprisonment.

185.    Pursuant to Government Code § 820.8, "nothing in this section exonerates a public employee from liability for injury proximately caused by his own negligent or wrongful act or omission."

186.    By engaging in the acts alleged herein, Defendants failed to act with ordinary care and breached their duty of care owed to Mr. Beck.

187.    Does 16-20 failed to act with ordinary care in failing to properly train and supervise their deputies with respect to proper procedures on detention, arrest, and the use of force.

188.    Defendant County of San Diego is vicariously liable for the actions of the Individual Defendants.

189.    The foregoing wrongful acts and failures to act of the Defendants seriously injured Mr. Beck. As a direct and proximate result of these actions and omissions, and each of them, Mr. Beck suffered damages including physical pain, emotional distress, humiliation, reputational harm, loss of income, and continuing anxiety and trauma regarding interactions with law enforcement.

190.    Defendants' conduct was willful, wanton, malicious, and oppressive, thereby justifying an award of punitive damages against the Individual Defendants (but not Defendant County of San Diego) in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

# ELEVENTH CAUSE OF ACTION
## Intentional Infliction of Emotional Distress
### Against All Defendants

191.    Plaintiff realleges and incorporates by reference the allegations of all preceding paragraphs as though set forth in full herein.

192.    Defendants' conduct alleged above was outrageous.

193.    Through their conduct alleged above, Defendants intended to cause Ms. Beck emotional distress, or acted with reckless disregard of the probability that Ms. Beck would suffer emotional distress.

194.    Defendant County of San Diego is vicariously liable for the actions of the Individual Defendants.

195.    The foregoing wrongful acts and failures to act of the Defendants seriously injured Mr. Beck. As a direct and proximate result of these actions and omissions, Mr. Beck suffered damages including severe emotional distress, humiliation, reputational harm, and continuing anxiety and trauma regarding interactions with law enforcement.

196.    Defendants' conduct was willful, wanton, malicious, and oppressive, thereby justifying an award of punitive damages against the Individual Defendants (but not Defendant County of San Diego) in an amount adequate to punish the wrongful conduct alleged herein and to deter such conduct in the future.

## PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court enter a judgment against Defendants as follows:

1) For general damages according to proof;

2) For special damages according to proof;

3) For exemplary and punitive damages against the Individual Defendants;

4) For attorney's fees pursuant to applicable statutes and ordinances;

5) For costs of suit;

6)  For interest, including prejudgment interest at the legal rate; and

7)  For such additional relief as this Court deems proper and just.

## **DEMAND FOR JURY TRIAL**

Plaintiff David Beck demands a trial of all causes by jury.

Dated: December 23, 2025          Respectfully submitted,

THE PEOPLE'S LAW PROJECT: LOS ANGELES

By:     */s/ Joshua J. Nuni*
          Joshua J. Nuni

IREDALE & YOO, APC

By:     */s/ Peter Bibring*
          Peter Bibring

Attorneys for Plaintiff

COMPLAINT