UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

DAVID BECK,

Plaintiff,

v.

COUNTY OF SAN DIEGO; et al.,

Defendants.

Case No.:  25-CV-3753 W (SBC)

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND [DOC. 4]**

Pending before the Court is Defendant County of San Diego's motion to dismiss Plaintiff's third, fourth, fifth, and eleventh causes of action, as well as the Doe Defendants. Plaintiff opposes.

The Court decides the matter on the papers submitted and without oral argument. *See* Civ. R. 7.1(d)(1). For the following reasons, the Court **GRANTS IN PART AND DENIES IN PART** the motion to dismiss **WITH LEAVE TO AMEND** [Doc. 4].

//

//

1

## I.    BACKGROUND

This lawsuit arises from the San Diego County Sheriff's response to a 9-1-1 call by Plaintiff's girlfriend as he was suffering from a "hypoglycemic episode." The following allegations are taken from the Complaint.

Plaintiff David Beck is 59 years old and has type II diabetes. (*Compl.* [Doc. 1] at ¶ 1.) On November 25, 2024, Beck was driving home after work and began experiencing a hypoglycemic episode related to his diabetes. (*Id.* at ¶ 18.) At the time, Beck was on the phone with his girlfriend, Lakeisha Holley, who noticed Beck was repeating himself and believed something was wrong related to his blood sugar. (*Id.* at ¶ 19.) Beck pulled over to the side of the road and was disoriented and weak. (*Id.* at ¶ 20.) Because he was disoriented, Beck could not tell Holley where he was. (*Id.*) She nevertheless called 9-1-1 and reported that Beck was pulled over and going into diabetic shock. (*Id.* at ¶ 21.) The 9-1-1 operator told Holley that they could not find Beck without a specific location. (*Id.*)

Holley left the house to find Beck based on what she knew about his general work route. (*Compl.* at ¶ 23.) While still on the phone with Beck, she heard a woman who had come up to Beck's window and asked if he was okay. (*Id.* at ¶ 24.) Beck believes the woman called 9-1-1 and gave the operator Beck's location. (*Id.*)

A few minutes later, Defendant San Diego County Sheriff's Deputy Thompson pulled up behind Beck's truck. (*Compl.* at ¶ 26.) The deputy approached the truck and spoke with Beck and Holley, who was still on the phone with Beck through the truck's speakerphone system. (*Id.* at ¶ 27.) They both informed Deputy Thompson that Beck had diabetes, was experiencing a hypoglycemic attack, and needed medical assistance. (*Id.* at ¶ 28.) Beck also believes the deputy saw a glucose device, which Beck had attached to his left arm. (*Id.* at ¶ 29.)

Holley asked the deputy for their location, which he provided. (*Compl.* at ¶ 30.) The phone call was disconnected. (*Id.* at ¶ 31.) Beck believes that Deputy Thompson "ordered Mr. Beck to get out of his truck instead of calling for medical attention." (*Id.* at ¶ 32.) After briefly exiting the truck, "the disoriented Mr. Beck turned to return to the vehicle, at

25-CV-3753 W (SBC)

which point Deputy Thompson began to physically detain him." (*Id.* at ¶ 33.) "Deputy Thompson then threw Beck to the ground and forcefully handcuffed him." (*Id.* at ¶ 34.) As a result, Beck suffered a "joint separation in his left shoulder and abrasions to his face." (*Id.* at ¶ 35.) The deputy then "forcibly placed" Beck into the back of his patrol cruiser, where he "continued to experience the symptoms of a severe hypoglycemic crisis." (*Id.* at ¶ 36.) Deputy Thompson then called for paramedics. (*Id.* at ¶ 37.)

When the paramedics arrived, Beck was restrained in the back of the patrol car. (*Compl.* at ¶ 38.) The paramedics measured Beck's blood sugar, which they found was "dangerously low, at 46 mg/dL" and noted "'minor slurred speech,' 'clammy skins,' and that Mr. Beck was 'confused on the date.' They also reported 'dried blood to the mouth and face area.'" (*Id.* at ¶ 39.) The paramedics then treated Beck's low blood sugar levels with oral glucose. (*Id.* at ¶ 40.)

Holley arrived at the scene and saw Beck in handcuffs receiving medical treatment. (*Compl.* at ¶ 44.) A female deputy (Defendant Doe 1) and another male deputy (Defendant Doe 2) were also on the scene. (*Id.* at ¶ 45.) As Holley recounted to Defendant Doe 1 what had happened, Deputy Thompson interrupted and stated, "You told me he was a diabetic, and I saw the thing on his arm. I had to rough him up a little bit. I gave him a resisting arrest." (*Id.* at ¶ 48.) Holley then asked, "Isn't that going to hurt him?" and the deputy "merely shrugged." (*Id.* at ¶ 50.) The other male deputy, Defendant Doe 2, was standing next to Beck while he was handcuffed receiving medical treatment. (*Id.* at ¶ 51.)

After receiving glucose gel from the paramedics, Beck started to come to. (*Compl.* at ¶ 52.) When he did, he saw deputies talking with Holley and realized he was in handcuffs. (*Id.*) He asked Defendant Doe 2 if he could take the handcuffs off because they were hurting him and the deputy replied, "We'll take them off when we're ready." (*Id.*)

Paramedics tested Beck's blood sugar again, which was low. (*Compl.* at ¶¶ 53–54.) Paramedics planned to take Beck to the hospital, but Holley said she could take Beck home and give him food to raise his blood sugar levels. (*Id.* at ¶ 54.) Paramedics agreed

25-CV-3753 W (SBC)

and released Beck into Holley's care. (*Id.*) Deputy Thompson then issued Beck a citation for Resisting Arrest, at which point the handcuffs were removed. (*Id.* at ¶ 55.)

When Beck got home, he was in "excruciating pain." (*Compl.* at ¶ 57.) About an hour later, Beck and Holley called the San Diego County Sheriff's Office ("SDCSO") and asked to talk to Deputy Thompson's supervisor. (*Id.* at ¶ 59.) A few hours later, Deputy Thompson's supervisor, Sergeant ("Stg.") Stilfield, returned their call and stated that he was aware of the incident with the deputy. (*Id.* at ¶¶ 60–61.) Beck stated that he felt the deputy used excessive force, and Sgt. Stilfield told Beck that Deputy Thompson stated that Beck had tried to take a swing at him and Beck tried to drive off. (*Id.* at ¶ 62.) Holley asked if he had seen the body camera footage and the sergeant stated that he "was 'going off of' what Deputy Thompson had told him." (*Id.* at ¶ 63.)

On January 10, 2025, the San Diego County District Attorney's Office declined to prosecute Beck for the Resisting Arrest. (*Compl.* at ¶ 67.) Beck contends he continues to be in pain from the injuries caused when Deputy Thompson threw him to the ground while disoriented, which interferes with his ability to work in his pool and spa care business and as a professional drummer. (*Id.* at ¶ 68.)

On December 23, 2025, Beck filed the this lawsuit alleging eleven causes of action for: (1) 42 U.S.C. § 1983 – Excessive Force; (2) 42 U.S.C. § 1983 – Unlawful Detention/Arrest; (3) 42 U.S.C. § 1983 – *Monell*; (4) 42 U.S.C. § 1983 – Violation of Title II of the Americans with Disabilities Act; (5) 29 U.S.C. § 794 – Violation of the Rehabilitation Act; (6) Cal Civil Code § 52.1 – Violation of the Bane Act; (7) Assault; (8) Battery; (9) False Imprisonment; (10) Negligence; and (11) Intentional Infliction of Emotional Distress. (*See Compl.*) Defendant County of San Diego (the "County") now moves to dismiss the third, fourth, fifth and eleventh causes of action, as well as Does 1–20. (*P&A* [Doc. 4-1] 1:6–12.) Plaintiff opposes the motion. (*See Opp'n.* [Doc. 5].)

//

//

25-CV-3753 W (SBC)

## II.   LEGAL STANDARD

The court must dismiss a cause of action for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. *See Disability Rights Mont., Inc. v. Batista*, 930 F.3d 1090, 1096 (9th Cir. 2019). A complaint may be dismissed as a matter of law either for lack of a cognizable legal theory or for insufficient facts under a cognizable theory. *See Election Integrity Project Cal., Inc. v. Weber*, 113 F.4th 1072, 1081 (9th Cir. 2024) (citations omitted).

In ruling on the motion, a court must "accept all nonconclusory factual allegations in the complaint as true" and construe them "in the light most favorable to the plaintiff." *D'Augusta v. Am. Petroleum Inst.*, 117 F.4th 1094, 1100, 1104 (9th Cir. 2024) (citations omitted). However, "[t]he court need not . . . accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Hartman v. Gilead Scis., Inc.,* 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

Complaints must contain "a short plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has interpreted this rule to mean that "[f]actual allegations must be enough to rise above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007). The allegations in the complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570). "The standard for granting leave to amend is generous." *United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011). A court should grant leave to amend unless the plaintiff could not possibly cure defects in the pleading. *See Brown v. Brita Prods. Co.*, 172 F.4th 1113, 1120 (9th Cir. 2026) (citing *Roth v. Garcia Marquez*, 942 F.2d 617, 629 (9th Cir. 1991)).

//

5

25-CV-3753 W (SBC)

## III.   DISCUSSION

### A.   The *Monell* Claim

To establish municipal liability under § 1983, a plaintiff must prove that his or her injury was the result of a municipal policy or custom. *Bd. of Cnty. Com'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403 (1997) (referencing *Monell v. Dept. of Social Services*, 436 U.S. 658, 689–92 (1978)). "A municipality may not be held liable under [42 U.S.C. § 1983] solely because it employs a tortfeasor." *Id.* Instead, "[l]ocating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Id.* at 403–04.

*Monell* liability may be based on either (1) "'a particular municipal action *itself* [that] violates federal law or directs an employee to do so'"; or (2) a failure to act, including a municipal failure to train, "to implement adequate policies or procedures to safeguard its community members' federally protected rights." *Hyun Ju Park v. City & Cty. of Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020) (quoting at *Brown*, 520 U.S. at 404, 407-08 (1996)); *Connick v. Thompson*, 563 U.S. 51, 59 (2011). To implicate liability based on a failure to act, a plaintiff must allege that the municipality exhibited deliberate indifference to the foreseeable risk that their federally protected rights would be violated. *Park*, 952 F.3d at 1143.

Deliberate indifference is a stringent standard of fault requiring proof that a municipal actor had actual or constructive notice that their inaction failed to safeguard federally granted rights and made the conscious decision to disregard the consequence of its inaction. *Connick*, 563 U.S. at 59, 61; *Brown*, 520 U.S. at 407. A policy may meet the deliberate indifference standard if it is either: (1) so obviously facially deficient that any reasonable policy maker would be on notice of the need to take action; or (2) if not obviously facially deficient, a plaintiff must ordinarily point to a pattern of violations of which the relevant policymakers had actual or constructive notice. *Park*, 952 F.3d at 1142.

25-CV-3753 W (SBC)

A failure to train may rise to deliberate indifference if the policy maker recognized or should have recognized the need to train its employees and the lack of training would cause the violation of federally granted rights. *Connick*, 563 U.S. at 59 (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822 (1985)). Generally, a pattern of similar constitutional violations by untrained employees is necessary to demonstrate deliberate indifference for a failure to train. *Id.* at 62 (citing *Brown*, 520 U.S. at 409). However, as recognized in *Connick*, in *Canton* the Court recognized that in "rare" circumstances "the unconstitutional consequence of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* at 64 (referencing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). Recognized as "single incident" liability, the pathway is viable when—considering the duties assigned to specific officers or employees—the need for more or different training is so obvious and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers can reasonably be said to have been deliberately indifferent to the need to act. *Canton*, 489 U.S. at 390. A municipality's culpability for deprivation of rights is most tenuous where a claim turns on a failure to train. *Connick*, 563 U.S. at 61.

Here, without identifying a pattern of similar constitutional violations, Beck identifies two paths of alleged liability in seeking to state a *Monell* claim against the County: (1) Beck's injury was the result of a facially deficient, unconstitutional policy; and (2) Beck's injury was caused by the failure to train patrol officers on how to appropriately respond to individuals experiencing a diabetic emergency. (*Opp'n.* at 5:20–11:17.)

To prevail under the first pathway, Beck's allegations must demonstrate that a policy's deficiencies would almost certainly lead to constitutional violations when foreseeably followed by employees. *Park*, 952 F.3d at 1142. In the Complaint, however, Beck does not allege that a policy led to the constitutional violation he experienced, but alleges that the lack of a policy caused his constitutional violation. Specifically, Beck alleges that because the SDCSO provides guidelines for recognizing and urgently

responding to diabetic emergencies to deputies assigned to jails but not patrol officers, this discrepancy amounts to a facially deficient policy. (*Id.* at ¶¶ 81–82.) Because Beck's claim is based on the absence of a policy for patrol officers, this pathway is insufficiently pled.

Even if this Court were to accept that the discrepancy in training guidelines for jail deputies and patrol deputies amounts to a policy, Beck's claim still lacks merit. In *Park*, which Beck cites as support for his claim, the Ninth Circuit held that the alleged facially deficient policy—which required off-duty officers to carry a firearm except when impaired from alcohol consumption—did not foreseeably give rise to the harm suffered by the plaintiff. 952 F.3d at 1142. There, the bartender-plaintiff was accidentally shot by an off-duty, police-officer patron who was inspecting his revolver while intoxicated. *Id.* at 1139. The court reasoned that the policy did not "obviously" give rise to the circumstance and plaintiff's injury for two reasons. *Id.* at 1142. First, the policy required off-duty officers to carry *holstered* pistols and not to unnecessarily unholster the weapon, even for inspection purposes. *Id.* Second, because the policy explicitly prohibited carrying firearms while intoxicated, a reasonable officer would not have entered a bar with the intention of becoming intoxicated while carrying a firearm. *Id.* Therefore, the court found the circumstance giving rise to the plaintiff's injury did not result from a facially deficient policy "obviously" in need of reform, but instead from the officer acting unforeseeably under the policy. *Id.*

Based on the Complaint's allegations, it is similarly clear that the guideline discrepancy did not give rise to the harm suffered by Beck. According to the Complaint, the SDCSO guidelines provided to jail-assigned deputies were intended to ensure that they *recognize* signs of diabetic emergencies to provide inmates with necessary medical attention. (*Compl.* at ¶¶ 75–78.) The guidelines were created with the purpose of "'understanding what diabetes is and how to recognize a diabetic emergency.'" (*Id.* at ¶ 76.) Guidelines for *recognizing* diabetic emergencies would not have prevented the harm suffered by Beck because Deputy Thompson recognized that Beck was suffering from a

diabetic emergency: Beck and Holley informed him of such, and Deputy Thompson saw Beck's glucose monitor. (*Id.* at ¶¶ 28–29, 48.) Thus, Deputy Thompson's use of excessive force was not the result of a facially deficient policy obviously in need of reform. Instead, like *Park*, Beck's injury was the result of Deputy Thompson's unreasonable decision to throw Beck to the ground and forcefully handcuff him despite being aware that he was exhibiting a diabetic emergency. (*Id.* at ¶ 48.)

Beck's Opposition also cites *Castro v. Cty. of Los Angeles* 833 F.3d 1060 (9th Cir. 2016) for support. In *Castro*, the Ninth Circuit held that the West Hollywood police station's failure to comply with affirmative regulations intended to mitigate the risk of harm suffered by the plaintiff amounted to deliberate indifference of the plaintiff's constitutional rights. *Id.* at 1078. There, the plaintiff, who was arrested for misdemeanor public drunkenness, was severely beaten by a man arrested on a violent felony and placed in the same sobering cell. *Id.* at 1065. The cell failed to comply with the California Building Code which required "an inmate or sound-actuated audio monitoring system" and failed to comply with the West Hollywood police station's own manual requiring that a sobering cell "allow for maximum visual supervision of prisoners by staff." *Id.* at 1077 (quoting Cal. Bldg. Code tit. 24 § 1231.2.22 (2007)). The station's manual also explicitly prohibited the use of non-compliant sobering cells. *Id.* The Court found the policies put the West Hollywood station on notice that their "customs or policies" of detaining arrestees in non-compliant sobering cells "posed a substantial risk of serious harm" to persons detained. *Id.* at 1078. By failing to comply with such policies despite being on notice, the station was deliberately indifferent to the harm that befell the plaintiff. *Id.*

*Castro* is also not helpful to Beck because, unlike the plaintiff in *Castro* whose injury was the result of non-compliance with the city code and the station's own policy, Beck's injury was not the result of a policy that Deputy Thompson failed to follow. (*Id.* at ¶¶ 33–34.) Instead, Beck improperly seeks to impose liability based on the lack of a policy.

25-CV-3753 W (SBC)

Regarding Beck's second pathway to *Monell* liability—the failure to train patrol officers in appropriately responding to those experiencing diabetic emergencies—Beck seeks to establish liability under *Canton's* "single instance" liability. As stated above, liability under this theory is rare and arises where the lack of training is all but certain to lead to a violation of an individual's constitutional rights. In *Canton*, for example, the Supreme Court proposed a hypothetical where police officers, untrained in the constitutional limitation of employing deadly force, are supplied with firearms to pursue fleeing felons. 489 U.S. at 390. Given the frequency with which police pursue fleeing felons, and the predictability that an officer lacking training on how to handle the pursuit will violate the citizen's constitutional rights, the Court explained that the city's failure to train officers on the use of force could reflect deliberate indifference to the high likelihood of constitution violations. *Id.*

A tangible example of "single incident" liability is *Kirkpatrick v. Cnty. Of Washoe*. 843 F.3d 784 (9th Cir. 2016). There, a child plaintiff's Fourth Amendment rights were violated after being removed from parental custody by the Washoe County Department of Social Services ("DSS"). *Id.* at 791. Under existing law, removal required either a court order or exigent circumstances. *Id.* Wilcox, the DSS worker who removed the child, admitted that exigent circumstances did not exist. *Id.* at 794. Further, DSS conceded that it had "no policy or procedures for obtaining warrants before removing children from parental custody" and did not train "its social workers to recognize that a warrant may be required." *Id.* at 796. Wilcox further testified that during her two years of employment, she "never receive[d] training on how to obtain a warrant. . . [nor] was instructed that social workers must obtain a warrant in non-emergency situations." *Id.* at 794. Moreover, employees admitted that it was regular practice to remove children from parental custody absent exigent circumstances. *Id.* Under these circumstances, the Ninth Circuit held "the municipality's 'inadequacy [is] so likely to result in the violation of constitutional rights that a jury could reasonably find § 1983 liability without needing a pattern of violations to find the county culpable." *Id.* (citing *Canton*, 489 U.S. at 390).

25-CV-3753 W (SBC)

Here, relying on the POST guidelines, which insists that peace officers know how to recognize diabetic emergencies, Beck alleges that because of the SDCSO's lack of training, the type of constitutional violation he suffered was "highly likely" to occur. (*Compl.* at ¶¶ 71, 89.) The Court disagrees. The primary problem is that unlike the *Canton* hypothetical or the circumstances in *Kirkpatrick*, the Complaint's allegations do not come close to suggesting similar encounters are "highly likely." Beck's only supporting factual allegation is that 14.7% of American adults suffer from diabetes. (*Id.* at ¶¶ 69–70). While the figure supports the contention that some drivers have diabetes, it is entirely insufficient to support the inference that it is highly likely that patrol officers who encounter drivers with diabetes suffering a hypoglycemic attack will use excessive force. Indeed, though there are many reported cases involving an officer's use of force against fleeing suspects[1] (the *Canton* hypothetical) and many reported cases involving the removal of children from parental custody[2] (*Kirkpatrick*), the same does not appear true regarding encounters between individuals suffering from hypoglycemic attacks and patrol officers using excessive force. To reiterate the standard, municipal liability is most tenuous when it turns on a failure to train, and the Supreme Court makes clear "single incident" claims are rare and reserved for extreme circumstances. For these reasons, this claim lacks merit.

### B.      The ADA and Rehabilitation Claims

To state a claim under Section 504 of the Rehabilitation Act, a plaintiff must allege "(1) he is an individual with a disability; (2) he is otherwise qualified to receive the

---

[1] *See e.g., Tenn. v. Garner*, 471 U.S. 1 (1985); *Chew v. Gates*, 27 F.3d 1432 (9th Cir. 1994); *Price v. Sery,* 513 F.3d 962 (9th Cir. 2008).

[2] *See e.g., Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000); *Rogers v. Cnty. of San Joaquin*, 487 F.3d 1288, 1294 (9th Cir. 2007); *Arce v. Childrens Hospital Los Angeles*, 211 Cal.App.4th 1455 (2022); *Mabe v. San Bernardino Cnty.*, 237 F.3d 1101, 1107 (9th Cir. 2001); *Ram v. Rubin*, 118 F.3d 1306, 1311 (9th Cir. 1997).

25-CV-3753 W (SBC)

benefit; (3) he was denied the benefits of the program solely because of his disability; and (4) the program receives federal financial assistance." *O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1060 (9th Cir. 2007) (quoting *Duvall v. County of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001)). Because Title II of the American with Disabilities Act (ADA) was expressly modeled after Section 504 of the Rehabilitation Act, a plaintiff stating a claim under Title II of the ADA must allege similar elements:

> (1) he is an individual with a disability; (2) he is otherwise qualified to participate in or receive the benefits of some public entity's services, program, or activities; (3) he was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of [his] disability.

*Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1045 (1999) (stating that "there is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act.")

To recover monetary damages, "a plaintiff must prove intentional discrimination on the part of the defendant." *Duvall*, 260 F.3d at 1138 (citing *Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (1998)). Courts utilize the deliberate indifference standard for determining intentional discrimination, which "requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that . . . likelihood." *Id.* (citing *Canton*, 489 U.S. at 389). When the public entity has notice that accommodating a disabled individual is required, the knowledge requirement of deliberate indifference is satisfied. *Id.* at 1139. Once notice is established, the public entity must determine what constitutes a reasonable accommodation, and the failure to accommodate the needs of an individual with disabilities will satisfy the failure to act requirement of deliberate indifference. *Id.* Determining the reasonableness of an accommodation is ordinarily a question of fact. *Sheehan v. City & County of San Francisco*, 743 F.3d 1211, 1233 (9th Cir. 2014).

Title II of the ADA broadly applies to police services, programs, and activities, which have been construed to encompass "anything a public entity does," and thus applies to arrests. *Sheehan*, 743 F.3d at 1232 (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001)). Courts have recognized at least two types of Title II ADA claims applicable to arrests: (1) where the police wrongfully arrest an individual with a disability because they misperceive the effects of that disability as criminal activity; and (2) where the police properly arrest an individual with a disability but fail to reasonably accommodate the disability, "causing the person to suffer greater injury or indignity in that process than other arrestees." *Id.*

Here, Beck is alleging the County violated his rights protected by Title II of the ADA and Section 504 of the Rehabilitation Act by failing to reasonably accommodate his needs in the process of an arrest which caused him greater harm. (*Opp'n.* at 12:12–14:4.)

The Ninth Circuit has held that a plaintiff may have a viable Title II claim where the officer has failed to accommodate the plaintiff's disability and the plaintiff asserts reasonable, alternative methods for the arrest. In *Sheehan*, a mentally ill individual with a knife made verbal threats against police officers who were called to assist in transporting her to a mental health facility. 743 F.3d at 1219. Without taking plaintiff's mental illness into account, the officers forcibly entered the room, pepper-sprayed, and shot the plaintiff several times. *Id.* at 1220. In the lawsuit that followed, plaintiff asserted that the officers should have diffused the situation without using deadly force by using methods like non-threating communication and respecting her space given her disability. *Id.* The defendants filed for summary judgment, which the district court granted. *Id.* The Ninth Circuit reversed, holding that determining whether plaintiff's proposed accommodation was reasonable in this circumstance is a question of fact for the jury. *Id.*

Here, the Complaint's allegations sufficiently allege that Deputy Thompson was on notice of Beck's disability: Deputy Thompson saw Beck's glucose monitor and was told by Beck and Holley of the hypoglycemic attack occurring. (*Compl.* at ¶¶ 28–29.) Therefore, Beck adequately alleges notice. The Complaint also alleges that Deputy

Thompson slammed Beck to the ground after Beck, disoriented and suffering from a hypoglycemic attack, simply turned to walk back to his car. (*Id.* at ¶ 34). That allegation is sufficient to demonstrate Deputy Thompson failed to reasonably accommodate Beck's disability.

The County nevertheless argues that these claims must be dismissed because Beck was not denied a program or service by reason of his disability and "the ADA prohibits discrimination because of a disability, not inadequate treatment for disability." *Simmons v. Navajo County*, 609 F.3d 1011, 1022 (2010). This rule, however, comes from cases rejecting ADA liability for a prison's medical malpractice against a disabled prisoner. *Id.* The rule is inapplicable to Beck's claim and contrary to *Sheehan's* holding that Title II applies to arrests. 743 F.3d at 1231. Therefore, Beck sufficiently alleges Title II ADA and Rehabilitation Act claims.

## C.    The Intentional Infliction of Emotional Distress Claim

A defendant is liable for the intentional infliction of emotional distress (IIED) when (1) their conduct—which is committed with the intention or reckless disregard to the probability of causing emotional distress—is so extreme and outrageous that it exceeds all bounds of that usually tolerated in civilized community; (2) the plaintiff has suffered severe or extreme emotional distress; and (3) the defendant's outrageous conduct is the actual and proximate cause of the plaintiff's emotional distress. *Hughes v. Pair*, 46 Cal. 4th 1035, 1050-51 (2009). The California Supreme Court has set a high bar for IIED claims, requiring that the plaintiff establish that the severe emotional distress be of such "substantial quality that no reasonable person in civilized society may be expected to endure it." *Id.* at 1051. California courts have permitted plaintiffs to recover for physical injury that flows directly from being intentionally subjected to mental and emotional distress. *See State Rubbish etc. Assn v. Siliznoff*, 38 Cal.2d 330, 337; *see also Fisher v. Fisher*, 118 Cal. App. 5th 899 (2026). However, it is insufficient for the defendant's conduct to merely cause the plaintiff's distress; the conduct must be "especially calculated

14

to cause mental distress of a very serious kind." *Christensen v. Superior Court*, 54 Cal. 3d 868, 903-05 (1991) (quoting *Ochoa* v. *Superior Court, supra*, 39 Cal.3d 159, 165 (1985)).

Here, though the Complaint alleges outrageous conduct committed with the intent of inflicting physical harm, there are no facts that show Deputy Thompson's decision to throw Beck to the ground and forcefully handcuff him was committed with the purpose of inflicting emotional distress. (*Compl.* ¶ 48.) After Deputy Thompson ordered him out of his truck, Beck exited the vehicle. (*Id.* ¶¶ 32–33.) Disoriented from his hypoglycemic attack, Beck "turned to return to [his] vehicle, at which point Deputy Thompson began to physically detain him" by throwing him to the ground and forcefully handcuffing him. (*Id.* ¶¶ 33–34.) These allegations do not suggest Deputy Thompson's actions were "especially calculated to cause mental distress of a very serious kind," but rather indicate his excessive, reactionary response to the situation that caused Beck's physical harm. It is not enough that Beck's subsequent emotional distress resulted from unlawful conduct; it must arise as the primary infliction of damage, and not from the aftermath of physical harm.

Similarly, the Complaint's allegations fail to show that any of the Doe Defendants actions were committed with the intent of inflicting emotional distress. (*Compl.* at ¶ 9-12.) Therefore, the Complaint fails to allege an IIED claim.

### D.    Claims Against Doe Defendants

While the Federal Rules of Civil Procedure do not explicitly allow the naming of fictitious or anonymous parties, "where the identity of the alleged defendant is not known prior to the filing of a complaint, the plaintiff should be given an opportunity through discovery to identify the unknown defendants, unless it is clear that discovery would not uncover the identities, or that the complaint would be dismissed on other grounds." *Hernandez v. San Bernardino Cnty.*, 2023 WL 3432206, at *3 (C.D. Cal. Jan. 26, 2023) (quoting *Wakefield v. Thompson*, 177 F.3d 1160, 1163 (9th Cir. 1999)). Still, a "Section 1983 action must allege how each individual defendant directly participated in the violation of the plaintiff's rights." *Id.* Thus, while a plaintiff "may refer to unknown

25-CV-3753 W (SBC)

defendants as Defendant John Doe 1, John Doe 2, John Doe 3 and so on . . . he must allege specific facts showing how each particular doe defendant violated his rights." *Keavney v. Cnty. of San Diego*, 2020 WL 4192286, at *4 (S.D. Cal. July 21, 2020). The reason behind these requirements is to give named defendants like the County "crucial notice of the nature of the claims" at issue. *Mendoza v. Cnty. of San Bernardino*, 2020 WL 2066142, at *4 (C.D. Cal. Feb. 21, 2020) (holding that the pleadings must be "sufficient to describe the involvement" of doe defendants and to put "the County on notice of the nature of the claim against it."). A supervising Doe "can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Starr v. Baca*, 652 F.3d 1202, 1208 (2011) (citing *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998)).

Under § 1983, a person deprives another of a constitutional right if they perform "an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which [the] complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (1978). For such claims, liability "must be based on the personal involvement of the [Doe] defendant." *Id.* (citing *May v. Enomoto,* 633 F.2d 164, 167 (9th Cir. 1980)). To hold members of a group liable, the plaintiff must "first establish the 'integral participation' of the officers in the alleged constitutional violation." *Jones v. Williams*, 297 F.3d 930, 935 (9th Cir. 2002) (quoting *Melear v. Spears*, 862 F.2d 1177, 1186 (5th Cir. 1989)).

Here, Beck alleges that three sets of Does are responsible for violating his constitutional rights, and are liable for assault, battery, violating the Bane Act, false imprisonment, and negligence. The first set of Does, 1–10, are the deputies who responded to the scene shortly after Deputy Thompson's use of force and seizure. The second set of Does, 11–15, allegedly reviewed Beck's complaint about Deputy

Thompson's conduct. The third set of Does, 16–20, are the officers and supervisors who allegedly failed to train Does 1–10 on how to handle diabetic emergencies.

Regarding Does 1–10, Beck claims they are liable under § 1983 for unreasonable seizure because they participated in issuing Beck's false citation for Resisting Arrest and because they refused to release him from his handcuffs when Beck no longer posed a threat. (*Compl.* at ¶¶ 104, 110.) The Court disagrees.[3] As the County points out, the Complaint alleges that Deputy Thompson alone issued Beck the citation for Resisting Arrest. (*Id.* at ¶ 55.) Only later does the Complaint plead in conclusory fashion that Does 1–10 were part of the decision to issue the citation. (*Id.* at ¶ 110.) Because there are no facts that support the inference they participated in Beck's citation decision, the Complaint fails to state a § 1983 claim against Does 1–10 based on an unreasonable seizure.

The Complaint also alleges that Does 1–10 should be liable for their failure to release Beck from handcuffs. (*Compl.* at ¶¶ 104, 106.) However, the timeline set forth within the Complaint does not plausibly allege any moment where Does 1–10 acted unconstitutionally in failing to unhandcuff Beck. Does 1–10 arrived onto the scene after Deputy Thompson had already "restrained [Beck] in the back of his patrol car," but before the paramedics arrived. (*Id.* at ¶¶ 38, 41.) When the paramedics arrived, they found Beck's blood sugar "dangerously low," and he was exhibiting "minor slurred speech, clammy skins, and . . . was confused on the date." (*Id.* at ¶ 39.) The paramedics then began to raise Beck's blood sugar levels with glucose. (*Id.* at ¶ 40.) At this point, Does 1–10 had only been around Beck while he was in a disoriented state. It is also notable that the Complaint alleges Beck had pulled his truck over, and thus the scene occurred on the side of a roadway. (*Id.* at ¶ 20). The Complaint continues that only after receiving glucose did Beck

---

[3] Neither in the motion to dismiss nor the reply does the County argue that an unreasonable seizure claim cannot extend to the deputies who allegedly failed to release Beck or who participated in the issuance of the citation. Because the County has not raised this issue, the Court assumes without deciding that these are viable paths to liability for these Doe defendants.

25-CV-3753 W (SBC)

"[start] to come to." (*Id.* at ¶ 52.) However, Beck's "glucose was still low" and the paramedics "planned to take him to the hospital." (*Id.* at ¶ 54.) Holley told the paramedics that she would be able to take Beck home and treat him. (*Id.*) The paramedics then agreed to release Beck into Holley's care, and shortly after Beck's handcuffs were removed. (*Id.* at ¶¶ 54–55.) One of the paramedics then drove Beck's truck home, further suggesting that Beck's disorientation continued to render him incapable of driving. (*Id.* at ¶ 56.) In short, the Complaint's factual circumstances convey that Beck remained in a disoriented state throughout the entirety of his interaction with Does 1–10. Beck was still not even fully recovered when Does 1–10 unhandcuffed him. Because under these circumstances there is no basis for finding Does 1–10 had reason to believe Beck's detention was unreasonable, the Complaint fails to allege a § 1983 claim against Does 1–10.

The Court's findings regarding the § 1983 claims also support the County's assertion that the Complaint insufficiently alleges state claims. The analysis above demonstrates that Does 1–10 did not participate in issuing the Resisting Arrest citation and did not unlawfully or unreasonably refuse to unhandcuff him upon his request. Furthermore, they arrived on the scene after Deputy Thompson had forcefully detained Beck; he was already handcuffed in the back of the patrol car. (*Compl.* at ¶ 41.) Thus, there are no facts alleged that this set of Does exerted any force onto Beck. Under these facts, Does 1–10 cannot be liable for assault, battery, false imprisonment, violating the Bane Act, or negligence.[4]

As for Does 11–15—the officers and supervisors who reviewed Beck's complaint about Deputy Thompson—the Complaint alleges they violated Beck's constitutional rights by approving and/or ratifying Deputy Thompson's conduct. (*Compl.* at ¶ 10.) There are two issues with this claim. First, the Complaint states in conclusory fashion that

---

[4] The Complaint does not explicitly list the conduct exhibited by Does 1–10 that makes them allegedly liable for negligence. Thus, the Court presumes the allegation is their negligence in refusing to unhandcuff Beck upon his request.

25-CV-3753 W (SBC)

"[u]pon information and belief. . . Does 11–15 reviewed the complaint Mr. Beck made with the SDCSO." (*Id*. at ¶ 112.) Even accepting this allegation as true, there are no facts to support the allegation that the Does had reason to believe Deputy Thompson's conduct was unlawful and acquiesced to it. When Beck called to report the incident, he spoke to Sgt. Stilfield who informed him that he was operating off Deputy Thompson's recount of the incident—i.e., that Beck had "tried to swing at [Deputy Thompson] and also that Mr. Beck had tried to drive off." (*Id*. at ¶ 62.) The Complaint does not allege facts indicating it was wrongful for Stg. Stilfield to rely on Deputy Thompson's recount of the incident, and only states that Beck asked for Deputy Thompson's body camera footage, which he was denied. (*Id*. at ¶ 65.) Significantly, the Complaint does not allege that Does 11–15 operated under greater knowledge of the incident than Sgt. Stilfield, and thus the Court can only presume these Does had the same knowledge of the incident. Because these allegations do not sufficiently establish knowledge that Deputy Thompson violated Beck's constitutional rights, the claim is insufficiently alleged.

Second, Beck's reliance on *Starr* is misplaced. In *Starr* the supervisor-defendant was the sheriff responsible for prisoners' safekeeping, which made him liable for being knowledgeable of unlawful and unsafe prison conditions that ultimately caused the plaintiff's injury. 652 F.3d at 1208. Unlike *Starr*, the Complaint has not sufficiently alleged that Does 11–15 were knowledgeable of any unlawful, unconstitutional conduct that caused Beck's injury. As the analysis above states, it cannot be said that Does 11–15 had sufficient knowledge to determine that Deputy Thompson's actions were unlawful or unconstitutional.

The Court's findings regarding the § 1983 claim, again support the County's assertion that the Complaint has failed to allege a negligence claim.[5] The prior analysis

---

[5] The Complaint does not explicitly list the conduct exhibited by Does 11–15 that makes them allegedly liable for negligence. Thus, the Court presumes the allegation is their negligence acquiescing Deputy Thompson's conduct.

19

25-CV-3753 W (SBC)

explains that, when considering the information available to Does 11–15, it was not unreasonable for them to have failed to flag or take any action regarding the incident. Thus, their conduct was not negligent. Regarding the remaining state claims—assault, battery, violating the Bane Act, and false imprisonment—this second set of Does cannot be liable because there are no allegations they were present at any point during Beck's arrest and forceful detention.

Regarding Does 16–20, the Complaint alleges they are liable because their failure to train the Deputy Defendants on how to handle diabetic emergencies was a moving force that caused Beck's injury. However, as discussed previously in the *Monell* section, the Complaint fails to state a failure to train claim. Therefore, Beck's § 1983 claim against Does 16–20 is also insufficiently alleged.

Like the previous set of Does, the Court's findings regarding the § 1983 claim supports the County's assertion that the Complaint has failed to allege a negligence claim. Since the County is not liable for failing to train certain deputies, there is no failure to train liability for Does 16–20; they cannot be negligent since there was no duty to train certain deputies in the alleged capacity. Regarding the remaining state claims—assault, battery, violating the Bane Act, and false imprisonment—this third set of Does cannot be liable because there are no allegations they were present at any point during Beck's arrest and forceful detention.

## IV.  CONCLUSION & ORDER

For the reasons discussed above, the Court **GRANTS IN PART AND DENIES IN PART** Defendant's motion to dismiss [Doc. 4] and **ORDERS** as follows:

- Plaintiff's third and eleventh causes of action, and the Doe Defendants are **DISMISSED WITH LEAVE TO AMEND**.
- Defendant's motion to dismiss Plaintiff's fourth and fifth cause of action is **DENIED.**

25-CV-3753 W (SBC)

- The Second Amended Complaint is due **on or before August 24, 2026**.

**IT IS SO ORDERED.**

Dated:  August 10, 2026

_____

Hon. Thomas J. Whelan
United States District Judge

25-CV-3753 W (SBC)